**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DR. GANDHI SELVANATHAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| vs. | : | NO.  11-3752 |
| | : | |
| OPPORTUNITIES INDUSTRIALIZATION | : | |
| CENTERS INTERNATIONAL, | : | |
| Defendant. | : | |

DuBOIS, J.                                                                                    May 10, 2012

**M E M O R A N D U M**

I.        **INTRODUCTION**

This is an employment discrimination case.  Plaintiff, Dr. Gandhi Selvanathan, alleges in the Amended Complaint that defendant Opportunities Industrialization Centers International ("OICI"), his former employer, discriminated and retaliated against him in violation of the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq.  Plaintiff's claims arise from two separate incidents: first, defendant's failure to hire him as the Director of Programs, which he asserts constituted discrimination on the basis of age, race, color, and national origin, as well as retaliation for filing an internal complaint regarding discrimination; and, second, defendant's refusal to rehire him for a different position, Director of Food Security, allegedly in retaliation for filing a charge with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC").

Presently before the Court is Defendant's Motion for Summary Judgment.  For the reasons that follow, the Court grants the motion in part and denies it in part.

II.     **BACKGROUND**[1]

    A.     **The Parties**

Defendant is an international non-profit organization that trains underprivileged individuals around the world in agriculture, health, and economic development.  (Defendant's Statement of Material Facts ("Def. SOF") ¶ 1–2.)  Defendant's administrative headquarters is in Philadelphia, although most of its work takes place in rural communities in Africa.  (Id. ¶¶ 1–2; Pl.'s Statement Undisputed Material Facts Preclude Summ. J. ("Pl. SOF") ¶ 7.)  Defendant employs approximately thirteen people in Philadelphia.  (Pl. SOF ¶ 8.)

Plaintiff, a sixty-seven year old man, was born in Pondicherry, India, on February 25, 1945.  (Pl. SOF ¶ 1–2.)  He characterizes his race as "Asian Indian."  (Deposition of Dr. Gandhi Selvanathan ("Pl. Dep."), Def.'s Mot. Summ. J. ("Def. Mot.") Ex. 1, at 8.)  He emigrated from India to the United States in 1983 and became a United States citizen.  (Pl. SOF ¶ 2.)  Plaintiff holds four degrees: a bachelor's degree in agriculture from the University of Madras, India; a master's degree in agriculture with a specialization in soil science from UP University in India; a doctorate in agriculture ecology from the University of Paris, France; and a master's degree in business administration from the University of Bridgeport, Connecticut, United States.  (Pl. SOF ¶ 1; see also Resume of Dr. Gandhi Selvanathan, Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl. Opp'n") Ex. B.)  Plaintiff began working in the agriculture field in 1966; prior to moving to the United States, he worked as a junior agricultural scientist at the UP University and as an assistant professor and researcher at the University of Algiers in Algeria.  (Id. ¶¶ 3–5.)

---

[1] As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the non-moving party.  The Court refers to the parties' statements of material facts only where those facts are not controverted.

### B.    Plaintiff's Employment with Defendant

Plaintiff began working for defendant in 1984 as an agricultural specialist.  (Def. SOF

¶ 4; Pl. SOF ¶ 6.)  He was promoted to Director of Agriculture and Food Security in 1993, and

he held that position until July 31, 1996, when he left OICI to pursue other opportunities.  (Id.

¶¶ 6–7; Pl. SOF ¶ 9.)  His responsibilities included "developing agricultural projects, monitoring

and guiding people in field work, and writing lesson plans and curriculum," as well as

"participating in pre-feasibility and detailed feasibility studies."  (Def. SOF ¶ 4; Pl. SOF ¶ 10.)

Between 1984 and 1996, plaintiff was the  "lead person who wrote and edited" and "lead

presenter" of numerous funding proposals for outside agencies, such as the United States Agency

for International Development ("USAID").  (Id. ¶¶ 11–12.)

Between 1996 and 2007, plaintiff owned and operated several gasoline stations in the

Philadelphia area.  (Id. ¶ 13; Def. SOF ¶ 8.)  During this time, plaintiff sometimes gave advice on

an unpaid, ad hoc basis to OICI CEO and president Ronald Howard about food security issues.

(Pl. SOF ¶ 14.)  Plaintiff rejoined OICI on a part-time basis in January 2007 and became a full-

time employee in September 2007.  (Id. ¶¶ 15, 19.)  When he returned to OICI, plaintiff "took on

the responsibilities" of the Director of Food Security but had the title of Deputy Director of Food

Security.  (Def. SOF ¶ 11; Pl. SOF ¶¶ 15–18.)  He reported to the OICI executive director, Molly

Roth,[2] and his duties were "essentially the same" as his duties from 1993 to 1996.  (Pl. SOF

¶¶ 20, 22.)  From 2007 to 2009, OICI was run by a three-person "management committee"

consisting of Roth, Vice President of Programs and Nigeria Country Director Alfred Tambe, and

Vice President of Finance Joel Affognon.  (Id. ¶ 33.)

---

[2] Roth was "Acting Executive Director" of OICI until "roughly" October 2008, when she
became "Executive Director."  (Pl. SOF ¶ 32.)

### C.      Plaintiff's Job Performance

Roth stated at her deposition that she believed plaintiff did not adequately perform his duties as Deputy Director of Food Security between 2007 and 2009.  (See Deposition of Molly Roth ("Roth Dep."), Def. Mot. Ex. 12, at 14.)  She had "concerns about his administration of the Food Aid Programs" and "grave concerns about his business development abilities."  (Id. at 14, 45.)  Roth never gave plaintiff any written performance reviews or any other documents regarding her concerns, although she stated that in 2007 or 2008 she twice told plaintiff that she "didn't believe he was performing at the level required, and . . . [she] was not satisfied with his performance."  (Id. at 14–16.)  Plaintiff claims that Roth never counseled him orally about his performance, and, to the contrary, two OICI country representatives, Leon Sakho and Carla Denizard, repeatedly complimented his work.  (Affidavit of Dr. Gandhi Selvanathan ("Pl. Aff."), Pl. Opp'n Ex. W, ¶¶ 2–6.)  Moreover, plaintiff asserts that defendant only had the opportunity to apply for one grant between 2007 and 2009 and that he played no "meaningful role in writing the proposal."  (Pl. SOF ¶ 76.)

### D.      Affognon's Conduct Towards Plaintiff

Plaintiff averred that, during an office move on an unspecified date, Affognon was helping him move a table and said: "Oh, you Asians, you are weaklings.  You never win anything in the Olympics."  (Pl. Dep. 104.)  Plaintiff interpreted this comment to mean that "in [Affognon's] mind, [Asian-Indians] are all inferiors" and "are not capable of doing any good work."  (Id. at 104–05.)

According to plaintiff, Affognon also "scream[ed] and shout[ed] at [plaintiff]" on an unspecified date in January 2008 when plaintiff asked Affognon if he had reviewed a budget for

a proposal.  (Sept. 30, 2008, Letter from Plaintiff to Edmund Cooke ("9/30/08 Cooke Letter"),

Pl. Opp'n Ex. N, at 2.)

### E.       The August 15, 2008, Affognon Incident

On August 15, 2008, plaintiff was working on a USAID report when he had an

altercation with Affognon, which plaintiff described at his deposition as follows:

> [W]e had been working very hard on getting the report ready, and
> the finance portion of the report was with Mr. Affognon, and he
> promised that it would be ready on my table by around 11:00 in the
> morning . . . . He came in around 2:30 . . . and he said he's finished
> the new budget because what came from the field was just
> horrible. . . .  So when I opened the report, I found that he had not
> formatted it.  It was in a totally unacceptable form to be sent to
> USAID.  Then I asked him around 2:45 or 3:00 that we cannot
> send this to USAID, and it has to be formatted properly. . . .
>
> When I said that, he got into a rage and said, Why you cannot do
> this? It's such a small – you cannot format Excel sheet?  He said so
> many things which I – very often see this pitch of his voice.  He
> used, frequently, the F-word too, and he said, This is the problem
> with you guys.  You're not even familiar with the latest way of
> doing things.
>
> I did not lose my patience.  I was not angry.  I said, Hold on, Joel.
> There is no need to scream like that.  He said, I have to leave, and
> you're asking me at 3:00.  You better do that.  And just pushed it
> towards me, and he was getting ready to leave.
>
> Then I told him, Mr. Joel, this is not the way.  We have to submit
> this report by 5:00, otherwise it will have serious consequences.
> He said, I don't care.  You go back to your home if you cannot do
> this report.  If you cannot format this, you're unfit to work here, so
> go back. That's what he said.

(Pl. Dep. 78–80 (paragraph breaks modified).)  Plaintiff completed the report with the help of

other OICI employees.  (Pl. SOF ¶ 27.)  Later that day, plaintiff began having chest pains and

went to the hospital.  (Id. ¶ 28.)  Doctors determined that plaintiff had a blocked artery and

performed surgery to place a stent.  (Id.)  Plaintiff missed approximately five days of work.  (Id.)

In an e-mail to Roth and Tambe, dated August 18, 2008, Affognon set forth his account of the incident.  (Aug. 18, 2008, E-mail from Affognon to "MC" ("8/18/08 Affognon E-mail"), Pl. Opp'n Ex. L, at 1.)  According to Affognon, he told plaintiff that "formatting a worksheet is a very basic task that he should know how to perform as the director of food security," and plaintiff "came yelling."  (Id.)  Affognon further stated in his e-mail that, "[a]s previously communicated to you and Alfred, I was and still am shocked that [plaintiff], our Director of Food Security[,] is unable to do any basic quantitative task using Excel.  I know that months ago we made the decision to recruit a new person for that position and based on the technical deficiency he confirmed to me last Friday, I think we should carefully proceed."  (Id.)

Another OICI employee, Michelle Frain Muldoon, wrote a two-page memorandum to Kilcrest and Roth ("8/18/08 Muldoon Memorandum"), setting forth an account of the incident.  Muldoon was able to hear the altercation through the wall of her office, which was located next to plaintiff's.  (8/18/08 Muldoon Mem., Pl. Opp'n Ex. K, at 1–2.)  According to Muldoon, the dispute arose because "[plaintiff] did not understand some technical aspect of the spreadsheet they were developing."  (Id.)  Affognon "eventually lost control and completely snapped at [plaintiff], yelling so loud that the entire office could hear him verbatim through the walls."  (Id.)

### F.   Aftermath of August 15, 2008, Affognon Incident

When he returned to work, plaintiff gave Roth and Vanessa Kilcrest, the OICI human resources officer, a three-page "grievance" letter regarding the Affognon incident ("8/17/08 Grievance Letter").  (Pl. Dep. 100; Def. SOF ¶ 18; see also 8/17/08 Grievance Letter, Def. Mot. Ex. 4.)  The letter is dated August 17, 2008, but plaintiff stated at his deposition that he gave it to Roth "about six days" after the incident.  (Id.)  Plaintiff spoke to Roth when giving her the letter, "repeated what [was] written," and said that he "want[ed] some justice."  (Pl. Dep. 99.)  Roth

responded that she "felt sorry" and would "follow the procedure for a grievance letter."  (Id. at

99–100.)  Plaintiff had a similar exchange with Kilcrest.  (Id. at 100–01.)

The account in the 8/17/08 Grievance Letter is similar to the one plaintiff gave at his

deposition, although some details differ.  For example, the 8/17/08 Grievance Letter did not state

that Affognon said "You're not even familiar with the latest way of doing things."  (8/17/08

Grievance Letter 1–3.)  In the 8/17/08 Grievance Letter, plaintiff further asserted:

> I could not believe that a 63-year-old man with more than 35 years
> of professional experience of which 13 years have been spent with
> OICI can be treated in such a brutal way and subjected to this sort
> of verbal aggression, abuse, defamation and disrespect.  It is a total
> violation of the fundamental human rights and I cannot believe that
> it can happen in a country like USA.
>
> As a result of this ordeal, I want to file defamation charges and
> grievances against [Affognon] . . . . I want this matter to be
> referred to the Board of Directors of OICI. . . . . I also want your
> assurance that there will be no retaliation or retribution . . . .

(Id. (paragraph breaks modified).)

On September 12, 2008, Affognon sent an e-mail to plaintiff, copied to Roth, with the

subject "FOLLOW UP."  (Sept. 12, 2008, E-mail from Affognon to Plaintiff, Def. Mot. Ex. 7.)

The e-mail stated: "Dear Gandhi: I write to let you know that I had no intention to offend you in

any way during the recent exchange we had on the Ghana Prep Budget.  I sincerely apologize for

that occurrence.  Thank you[,] Joel."  (Id. (emphasis in original).)

Plaintiff sent a letter to Edmund Cooke, the chairman of defendant's Board of Directors,

on September 30, 2008, in which he stated that he wanted to be told "the position of the Board"

and "what action the [Board of Directors] plan[ned] to take" regarding Affognon.  (9/30/08

Cooke Letter 1–2.)  Plaintiff wrote that he was "perturbed to note that a senior person in age, in

experience and in association with OICI can be treated with contempt by a new comer [sic.] who

does not have even 4 years experience with OICI." (Id. at 2.) On October 17, 2008, plaintiff

sent Cooke an additional letter, stating that he had "heard nothing from OICI [Board of

Directors] or from OICI management" despite Roth telling him that the Board would be "acting

soon." (Oct. 17, 2008, Letter from Plaintiff to Edmund Cooke ("10/17/08 Cooke Letter"), Pl.

Opp'n Ex. O, at 1–2.)

### G. OICI's Response to Affognon Incident

Roth investigated the 8/17/08 Grievance Letter by conducting a series of interviews and

collecting written statements over a period of several months. (Def. SOF ¶ 22; Roth Dep. 18–

28.) Roth then provided a report to Cooke, dated February 9, 2009,[3] containing a summary of

Affognon incident and her recommendations for the OICI Board of Directors. (Id. at 19–20; see

also Investigation Into Grievance Communicated by Dr. Gandhi Selvanathan, August 17, 2008

("2/9/09 Roth Memorandum"), Def. Mot. Ex. 5.) In the 2/9/09 Roth Memorandum, Roth wrote:

"I find that although Mr. Affognon may not have intended harm or offense to Dr. Selvanathan

and did not consider his behavior outside the boundaries of acceptable office discourse, his

actions were in violation of OIC International's Standards of Conduct. It is clear that Dr.

Selvanathan felt himself to be disrespected and was considerably shaken . . . ." (Id. at 2.)

Around March 11, 2009, Roth gave plaintiff a memorandum dated September 22, 2008 ("9/22/08

Roth Letter"), setting forth in summary fashion much of the content of the 2/9/09 Roth

Memorandum.[4] (9/22/08 Roth Letter, Def. Mot. Ex. 6, at 1.) The 9/22/08 Roth Letter reiterated

---

[3] The 2/9/09 Roth Memorandum lists conduct prior to February 9, 2009, in its
"Recommendations" section—for example, "Mr. Affognon issues a written apology to [plaintiff]
by September 22, 2008." (Id. at 2.)

[4] The parties agree that, notwithstanding the date on the 9/22/08 Roth Letter, Roth gave it to
plaintiff on about March 11, 2009. (See Roth Dep. 30–31 (stating that "the September date is
probably a mistake"); Pl. SOF ¶ 47.) Plaintiff has submitted an e-mail message he sent to Roth

Roth's conclusion that Affognon's "actions were not consistent with OIC International's standards of conduct."  (Id.)

### H.    Director of Programs Position

On August 19, 2008,[5] defendant posted a job listing for "Director of Programs" on its website.  (Director of Programs Job Description, Def. Mot. Ex. 9, at 1.)  The Director of Programs was to be "responsible for developing new programs, identifying program funding sources, and building institutional relationships."  (Id.)  The requirements included, inter alia, a master's degree and at least six years experience "with design and implementation of rural development projects."  (Id. at 3.)  The website job listing stated that applications should be sent to Roth, but a second job listing directed applicants to apply by e-mail to Affognon. (Information About Director of Programs Advertisement, Pl. Opp'n Ex. T, at 2.)

Plaintiff sent an application to Roth by e-mail on September 2, 2008.  (Director of Programs Application, Pl. Opp'n Ex. U.)  According to Roth, she received many of the resumes and, with the help of an outside consulting firm, processed and ranked them.  (Roth Dep. 37–42.) Although defendant stated in its answers to plaintiff's interrogatories that "Plaintiff never applied for the Director of Programs position," (Def.'s Answers & Objs. Pl.'s First Set of Interrogatories Directed Def. ("Def. Ans. Interrogs."), Pl. Opp'n Ex. V, at 4), Roth conceded at her deposition that plaintiff applied "as soon as the position was posted," (Roth Dep. 38–39).  Of the thirty to fifty applicants, plaintiff was the only one employed by defendant at that time.  (Pl. SOF ¶ 58.)

---

on March 13, 2009, stating that he received the 9/22/08 Roth Letter on March 11, 2009.  (March 13, 2009, E-mail from Plaintiff to Roth, Pl. Opp'n Ex. Q, at 1.)

[5] Plaintiff states that the description was posted on August 23, 2008, which is the date on the print-out of the webpage rather than the "posted date" that appears on the description.  (Director of Programs Job Description 1.)

Roth's deposition testimony was contradictory as to the role of the other management committee members, Affognon and Tambe, in the selection process; she stated at one point that the decision "would be by agreement among the management committee members" and at a different point that Affognon was not "involved in any way" in selecting and ranking candidates. (Roth Dep. 38, 42.)  Michael Carson interviewed with Roth and Affognon for the Director of Programs position in December 2008 or January 2009.  (Deposition of Michael Carson ("Carson Dep."), Def. Mot. Ex. 8, at 13–17.)  Carson was born on April 14, 1962, (id. at 7), and is African-American.[6]  In late February 2009, defendant hired Carson as the Director of Programs. (Def. SOF ¶ 28.)

Plaintiff was not interviewed.  (Pl. SOF ¶ 82.)  According to Roth, she was "confused about why [plaintiff] would present his resume" and "told him that [she] wouldn't consider him" when he presented his resume because she had previously "told him that [she] found his job performance unsatisfactory in a large number of ways."  (Roth Dep. 39.)  Plaintiff contends that Roth never made any of these statements.  (Pl. Aff. ¶¶ 8–9.)  To the contrary, he claims that Roth, on several occasions, made statements such as: "We have to bring in more younger people to the top management of OICI" and "The people who . . . graduated [a] long time back, they are not well-equipped to perform managerial duties these days."  (Pl. Dep. 182.)

I.       **Plaintiff's Termination; First EEOC Charge**

In early August 2009, Roth and Carson advised plaintiff that he was being terminated effective September 1, 2009.  (Pl. SOF ¶ 92.)  Defendant contends that plaintiff was terminated because defendant could no longer fund his position due to changes in the grants on which defendant relied to operate.  (See id.; see also Roth Dep. 16–17; Carson Dep. 24–25 ("[T]he

---

[6] The Court has been unable to find evidence as to Carson's race in the record.  However, because defendant has not contradicted plaintiff's assertion that Carson is African-American, (Pl. SOF ¶ 88), the Court assumes the truth of that assertion for purposes of this motion.

grants [plaintiff] was working on, those were the programs that were ending.  And so I think the issue was financial.").)  After plaintiff's termination, defendant hired a consultant, Thoric Cederstrom, who performed some of the duties plaintiff had previously performed.  (Def. SOF ¶ 55, Pl. SOF ¶ 102.)

On August 31, 2009, plaintiff filed a charge with the EEOC and PHRC ("First EEOC Charge"), alleging that defendant "did not consider [him] for promotion or selection and terminated [his] employment because of [his] age (64) and in retaliation for filing an internal complaint about discrimination."  (First EEOC Charge, Def. Mot. Ex. 2, at 1.)  After being terminated, plaintiff was unable to find employment.  (Pl. SOF ¶ 104.)

**J.    Discussions of Possible Return to OICI**

Defendant hired Crispian Kirk to be chief executive officer ("CEO") in September 2009, and Roth and Affognon left their positions by mutual agreement so that Kirk could "build [his] own team," with the goal of "build[ing] a new OIC."  (Deposition of Crispian Kirk ("Kirk Dep."), Def. Mot. Ex. 11, at 14, 46; <u>see also</u> Def. SOF ¶¶ 58–59.)  Kirk "reviewed OICI's structure and made various changes in strategic planning and job positions."  (Decl. of Crispian Kirk ("Kirk Decl."), Praecipe to Attach Exhibit (Doc. no. 19), ¶ 2.)

Plaintiff remained in touch with Leon Sakho, defendant's Country Director for Ghana and Regional Director for Africa.  (Pl. SOF ¶¶ 112, 114.)  In either December 2009 or January 2010, Sakho told plaintiff that OICI was "not taking good care of food security projects."  (Pl. Dep. 150.)  In June 2010, defendant won a large food security grant from USAID, due in large part to work performed by the consultant, Cederstrom.  (<u>Id.</u> ¶ 5; Pl. SOF ¶ 106.)  The grant required defendant to hire an employee to work on food security issues.  (Carson Dep. 47–48;

Kirk Decl. ¶ 5.)  Kirk directed Kilcrest to post a job listing for a Director of Food Security or

"Food Aid Specialist."  (Kirk Dep. 33, 35–36.)

      The parties agree that Kirk and plaintiff met at an Applebee's restaurant in Philadelphia

on June 28, 2010.  (Def. SOF ¶¶ 71–75; Pl. SOF ¶¶ 112–18.)  However, the parties dispute the

nature of the communications that led to the meeting.

      In plaintiff's version of events, Sakho sent plaintiff an e-mail that stated, in relevant part:

"Please call Crispian Kirk, the President and CEO of OIC International, at [telephone number]."

(June 28, 2010, E-mail from Sakho to Plaintiff, Def. Mot. Ex. 19, at 1.)  Plaintiff then called

Sakho, who said: "he wants to see you . . . as early as possible because he wants to bring

somebody on board to take care of the food security projects."  (Pl. Dep. 151; see also Pl. Dep.

153 (plaintiff's testimony that Sakho told him Kirk was "waiting for your call" to discuss

"reinstating" plaintiff).)  After talking to Sakho, plaintiff immediately called Kirk, who said: "I'd

like to meet you today as soon as possible" and told plaintiff that he did not want to meet with

plaintiff in defendant's office. (Id. at 154–55.)

      According to defendant, plaintiff initiated contact.  Although he did not know plaintiff,

Kirk was willing to speak to him because he had heard positive things about him from other staff

members.  (Kirk Decl. ¶ 11.)  Before plaintiff called him, Kirk was concerned about the

"potential lawsuit" represented by plaintiff's EEOC complaint and "considered inviting Dr.

Selvanathan back to OICI."  (Id.; Kirk Dep. 46.)  Kirk told Sakho: "if [plaintiff] wants to talk to

me, give him my cell phone number, he can call me."  (Kirk Dep. 50; see also Kirk. Dep 45

("Sakho called me and said he has been talking to [plaintiff], and [plaintiff is] a nice guy and he

wants to talk to you.  I told Mr. Sakho to give [plaintiff] my cell phone number.").)  When

plaintiff called Kirk, Kirk felt a "sense of urgency" because he thought "[m]aybe we could get

rid of this lawsuit" and agreed to meet plaintiff for lunch at Applebee's the same day, June 28, 2010.  (Id. 50.)

The parties also disagree as to what happened during the meeting.  Plaintiff contends that during the lunch Kirk offered him the position of Director of Food Security, and plaintiff immediately accepted.  (Pl. Dep. 158–59.)  Kirk stated that the salary would be $75,000 and asked: "How fast can you join?," to which plaintiff responded: "[a]s soon as you are ready and complete all the formalities."  (Id. at 159.)  Kirk said he would have the human resources department do so "right away," then asked plaintiff whether he would withdraw his EEOC complaint if he rejoined OICI.  (Id. at 160.)  Plaintiff responded that Kirk should talk to plaintiff's attorney but did not "see any problem."  (Id.)  Kirk told plaintiff that defendant could pay for plaintiff's "attorney's fees and other expenses" and that plaintiff could expect to hear from human resources within a day or two.  (Id.)  In the interim, Kirk instructed plaintiff "not to call him either on OICI's official phone or send an e-mail to him."  (Id. at 162.)  On July 2, 2010, Kirk called plaintiff and said that he could not hire plaintiff due to the pending EEOC charge. (Id. at 163–64 (plaintiff's testimony that Kirk said: "Unless you withdraw the lawsuit, I cannot do anything.  I cannot even talk to the board of directors.  First, you have to withdraw the lawsuit.").)  Kirk and plaintiff did not have any further interaction, although plaintiff spoke to Sakho, who expressed that he was "very surprised and shocked" but that "legal things have to be cleared."  (Id. at 165.)

According to Kirk, the meeting lasted forty-five minutes, during which the parties discussed OICI, its history, and plaintiff's prior employment with OICI.  (Kirk Dep. 52–53.)  At some point, Kirk "asked [plaintiff] what kind of candidate [Kirk] should be looking for" as a potential Director of Food Security, and plaintiff eventually "said he wanted to come back and

work for OIC." (Id. at 53.)  Kirk responded: "[M]aybe you can come on as an advisor or a consultant."  (Id.)  Plaintiff "wanted to start the next day," but "[t]hat was the end of the discussion."  (Id.)  According to Kirk, plaintiff did not specifically express interest in the Director of Food Security position.  (Id. at 54–55.)

Kirk testified at his deposition that, when the meeting ended, he "was hoping" to hire plaintiff for some position.  (Id. at 55.)  However, according to Kirk, before he took action: "[Plaintiff] called me back and told me that he talked to his wife and to his lawyer and said, in order for me to hire him as an advisor or consultant, I would have to pay him $75,000.  And I had to pay hundreds of thousands of dollars in lawyer fees because he talked to his lawyer . . . and OIC just did not have the budget to do that."  (Id. at 55–56.)

On July 9, 2010, defendant offered ASM Jangahir the position of Director of Food Security.  (July 9, 2010, Offer Letter, Pl. Opp'n Ex. DD, at 1.)  Jangahir accepted and began working at OICI in early August 2010.  (Aug. 11, 2010, E-mail from Kirk, Pl. Opp'n Ex. EE, at 1.)  Jangahir is from Bangladesh and was born on February 1, 1951.  (Def. SOF ¶ 64.)

### K.    Amendment to First EEOC Charge and Second EEOC Charge; Plaintiff Files This Case

On September 21, 2010, plaintiff filed an amendment to the First EEOC Charge, in which he added race, color, and national origin as alleged grounds of discrimination in relation to his not receiving the Director of Programs position and subsequent termination.  (Sept. 21, 2010, Amendment to First EEOC Charge ("Amended First EEOC Charge"), Pl. Opp'n Ex. Z, at 1.)  Plaintiff filed an additional charge with the EEOC and PHRC ("Second EEOC Charge") on November 15, 2010, in which he alleged that, in not hiring him as Director of Food Security, defendant discriminated against him based on his race, color, national origin, and age and retaliated against him for filing the First EEOC Charge.  (Second EEOC Charge, Pl. Opp'n Ex.

Z, at 1–3.)  The EEOC issued right-to-sue letters regarding both charges on May 31, 2011; the PHRC closed the first case on October 18, 2010, and closed the second case on July 5, 2011. (Pl.'s First Am. Compl. ("Am. Compl.") ¶¶ 5–7.)  Plaintiff filed his initial Complaint in this case on June 9, 2011, and filed the Amended Complaint on August 10, 2011.  Both the Complaint and Amended Complaint assert exactly the same causes of action; the only difference between the two is that the Amended Complaint states that the PHRC closed its second case regarding plaintiff on July 5, 2011.  (<u>Compare</u> Compl. ¶ 7 <u>with</u> Am. Compl. ¶ 7.)

## III.   LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  <u>Wishkin v. Potter</u>, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  <u>Fireman's Ins. Co. v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

## IV.   DISCUSSION

The Amended Complaint contains six counts.  Counts I through IV are based defendant's selection of Carson instead of plaintiff as Director of Programs.[7]  Plaintiff alleges that this conduct constituted: age discrimination in violation of the ADEA, (Count I, Am. Compl. ¶¶ 50–52); age discrimination in violation of the PHRA, (Count II, id. ¶¶ 53–55); race, color, and national origin discrimination in violation of Title VII, (Count III, id. ¶¶ 56–58); race, color, and national origin discrimination in violation of the PHRA, (Count IV, id. ¶¶ 59–61).

Plaintiff also contends that defendant retaliated against him on two occasions: first, by not selecting plaintiff as Director of Programs in retaliation for filing an internal grievance alleging age discrimination; and second, by not hiring him as Director of Food Security in retaliation for filing an EEOC charge.  (Id. ¶¶ 62–67.)  Plaintiff alleges that this conduct violated the ADEA (Count V, id. ¶¶ 62–67), and the PHRA (Count VI, id. ¶¶ 68–72).

The Court will address plaintiff's claims as follows: (1) whether defendant's decision not to hire plaintiff as Director of Programs constituted discrimination based on age (Counts I & II); (2) whether defendant's decision not to hire plaintiff as Director of Programs constituted discrimination based on race, color, or national origin (Counts III & IV); (3) whether defendant retaliated against plaintiff, first by not hiring him as Director of Programs, and second by not hiring him as the Director of Food Security (Counts V & VI)

---

[7] In his Opposition to Defendant's Motion for Summary Judgment, plaintiff withdrew his claims relating to his termination.  (Pl. Opp'n Mem. 18 n.3.)  Also, defendant interprets Counts I through IV to be alleging age, race, color, and national origin discrimination on a disparate treatment theory as well as a hostile work environment theory.  (Def. Mem. 17–21.)  However, the Amended Complaint did not assert hostile work environment claims, and plaintiff confirmed in his response to the motion that he was proceeding only on a disparate treatment theory.  (Pl. Opp'n Mem. 18 n.3, 30 n.11.)

## A.      Age Discrimination: Failure to Hire Plaintiff as Director of Programs

Plaintiff's age discrimination claims, addressed in this section of the Memorandum, are set forth in Counts I and II of the Amended Complaint.

### 1.      **McDonnell Douglas** Burden-Shifting Analysis

The ADEA[8] prohibits age discrimination in employment against any person over the age of forty.  29 U.S.C. § 623(a)(1).  ADEA claims are subject to the three prong burden-shifting analysis originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  Plaintiff bears the burden of establishing a prima facie case of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  If plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for the adverse employment action.  See id. This burden is one of production, not persuasion.  Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009).  If defendant offers a legitimate nondiscriminatory reason, in order to survive summary judgment, plaintiff must submit evidence "to demonstrate that the employer's proffered rationale was a pretext for [] discrimination."  Id.  Notwithstanding this burden-shifting framework, plaintiff always bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 n.10 (3d Cir. 2003).

### 2.      Prima Facie Case Under the ADEA

A plaintiff makes out a prima facie case of age discrimination by showing: (1) that he is over 40; (2) that he is qualified for the position in question; (3) that he suffered an adverse employment decision; and (4) that he was replaced by a sufficiently younger person to permit an

---

[8] This analysis applies with equal force to Count II, plaintiff's PHRA age-discrimination claim, because the same legal standard applies.  Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005).

inference of age discrimination.  <u>Smith</u>, 589 F.3d at 689.  Defendant argues that only the first and fourth elements are met.  (<u>See</u> Def. Mem. 24.)

As to the second element, defendant has not made a specific argument why plaintiff was not qualified for the position of Director of Programs.  The Court construes defendant's argument as to its legitimate non-discriminatory reason for not hiring plaintiff—his unsatisfactory job performance as Deputy Director of Food Security, (Def. Mem. 25–26)—as applying to the question of plaintiff's qualifications.  To show that he was qualified, plaintiff "must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion."  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 647 (3d Cir. 1998) (citing <u>Fuentes v. Perskie</u>, 32 F.3d 759, 767 (3d Cir. 1994)).  The Court concludes that a factfinder could reasonably infer that plaintiff met the requirements for the Director of Programs position.  (Director of Programs Job Description 1–3.)  Defendant sought someone who would be "responsible for developing new programs, identifying program funding sources, and building institutional relationships."  (Director of Programs Job Description 1.)  Plaintiff, who holds a doctorate and worked in project development and funding for defendant from 1984 to 1996 and again beginning in 2007, exceeded the requisite qualifications, which included, <u>inter alia</u>, a master's degree and at least six years experience "with design and implementation of rural development projects."  (<u>Id.</u> at 3.)

To the extent that defendant contends plaintiff was not qualified based on his allegedly poor performance, genuine disputes of material fact remain as to whether plaintiff was meeting defendant's expectations.  Roth stated that she was not satisfied with plaintiff's work, (Roth Dep. 14), and the August 15, 2008, incident demonstrates that Affognon agreed.  However, defendant

has not presented any documentary evidence such as performance reviews that would tend to show that plaintiff was not executing his duties adequately.[9]  Against this evidence, plaintiff stated that he was never counselled about any work performance issues and that two country representatives, Leon Sakho and Carla Denizard, were very pleased with his work.  (Pl. Aff. ¶¶ 2–5.)  In addition, defendant implicitly endorsed plaintiff's qualifications by considering him for another position in June and July 2010.  From this evidence, a factfinder could conclude that plaintiff was qualified for the Director of Programs position, see Simpson, 142 F.3d at 647, and the parties' dispute as to plaintiff's job performance is more properly addressed in the subsequent steps of the McDonnell Douglas analysis.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992) (observing that, "[i]n Title VII cases involving a dispute over 'subjective' qualifications . . . the qualification issue should often be resolved in the second and third stages of the McDonnell Douglas/Burdine analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case").

As to the third element of plaintiff's prima facie case—an adverse employment action—defendant has presented no argument, and the Court concludes that plaintiff has met his burden. A plaintiff only needs to show a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Whether viewed as a failure to promote or a failure to hire, defendant's decision not to select plaintiff for the Director of Programs position was an adverse employment action.

---

[9] The 8/18/08 Affognon E-mail is not persuasive evidence of plaintiff's poor job performance, given that Affognon wrote it in his own defense following the August 15, 2008, altercation. Moreover, the deficiency Affognon criticized—plaintiff's "technical deficiency," (8/18/08 Affognon E-mail 1)—was not among those listed by Roth.

The Court thus concludes that plaintiff has made out a prima facie case of age discrimination under the ADEA, satisfying the first step of the McDonnell Douglas framework. The Court will next address the second step, whether defendant has offered a legitimate, non-discriminatory reason for not hiring plaintiff as Director of Programs.

### 3.      Legitimate, Nondiscriminatory Reason

Defendant avers that it selected Michael Carson and not plaintiff as the Director of Programs because Carson was well qualified and because plaintiff's job performance as Deputy Director of Food Security was unsatisfactory, especially to the extent that he "failed to obtain food security grants to maintain the financial viability of OICI."  (Def. Mem. 25–26.)  This satisfies defendant's "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 759).

### 4.      Pretext

At the third step of the McDonnell Douglas framework, plaintiff must show that the employer's proffered legitimate, non-discriminatory reason for the adverse employment action is pretext for discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981).  To establish pretext, a plaintiff has two options.  He must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes, 32 F.3d at 764; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

-20-

The first means of showing pretext is to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller, 130 F.3d at 1109 (quoting Fuentes, 32 F.3d at 765).  It is not enough that the employer's decision was "wrong or mistaken;" rather, a plaintiff must demonstrate that "the employer's articulated reason was . . . so plainly wrong that it cannot have been the employer's real reason." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999) (internal quotations omitted).  The second way to establish pretext is by "point[ing] to evidence with sufficient probative force" as to lead a factfinder to conclude "that the employer has previously discriminated against [plaintiff], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson, 142 F.3d at 644–45.

On the present state of the record, a factfinder could reasonably conclude that defendant's nondiscriminatory reason for not selecting plaintiff for the Director of Programs position was pretext for age discrimination under both approaches to the pretext analysis.[10]  As to the first manner of showing pretext, there are several frailties in defendant's proffered legitimate nondiscriminatory reason, showing that the supposed nondiscriminatory reason may be "either a post hoc fabrication or otherwise did not actually motivate the employment action."  See Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).  First, there are "inconsistencies" and "contradictions": defendant originally claimed that plaintiff did not apply for the Director of Programs job, (Def. Ans. Interrogs. 4), but now argues that plaintiff's "job performance was

---

[10] Defendant relies on its use of an outside recruiter to insulate itself from plaintiff's claims of discrimination, (Def. Mem. 25), but the Court rejects this argument.  Applicants were instructed to apply to either Roth or Affognon, and Roth and the management committee had at least some responsibility for evaluating the applications.  (Roth Dep. 38.)

unsatisfactory," (Def. Mem. 25).  This unexplained change in position alone is troubling, but

defendant has not been consistent about how plaintiff's work was subpar: Affognon was

bothered by plaintiff's "technical deficiency" regarding use of Microsoft Excel, (8/18/08

Affognon E-mail 1), while Roth allegedly found fault with plaintiff's failure to obtain grants,

(Roth Dep. 14).  Moreover, as discussed supra, there are genuine disputes of material fact

regarding whether plaintiff's work as Deputy Director of Food Security was, in fact, inadequate,

given the contradictory testimony of Roth and plaintiff and the lack of documentary support for

defendant's contentions that plaintiff had a poor track record.  See Brewer v. Quaker State Oil

Refining Corp., 72 F.3d 326, 331 (3d Cir. 1995) ("On summary judgment, it is not the court's

role to weigh the disputed evidence and decide which is more probative.").  These genuine

disputes of material fact with respect to defendant's proffered nondiscriminatory reason for not

selecting plaintiff preclude the Court from granting Defendant's Motion for Summary Judgment

on this issue.

     As to the second manner of establishing pretext, plaintiff has introduced evidence from

which a jury could conclude that age discrimination was "more likely than not a motivating or

determinative cause of the employer's action."  Fuentes, 32 F.3d at 764. Circumstantial evidence

demonstrates that two of the decisionmakers in the hiring process, Roth and Affognon, may have

rejected plaintiff's application based on plaintiff's advanced age.  First, the fact that defendant

selected a much younger individual for the position than plaintiff—Carson is approximately

seventeen years younger—is circumstantial evidence of age discrimination.  See Maxfield v.

Sinclair Int'l, 766 F.2d 788, 792 (3d Cir. 1985) ("a substantial difference in the ages may be

circumstantial evidence that gives rise" to an inference of age discrimination).  Plaintiff also

claims that "on several occasions while [plaintiff] was working at OICI, Executive Director

Molly Roth made statements such as: 'We have to bring in younger people to the top management of OICI.'" (Pl. Opp'n Mem. 25.)  In addition, plaintiff asserts that Affognon stated during his August 15, 2008, tirade: "This is the problem with you guys.  You're not even familiar with the latest way of doing things," (Pl. Dep. 79), which supports the allegations of age discrimination.  See Marlow v. Chesterfield Cnty. Sch. Bd., 749 F. Supp. 2d 417, 428 (E.D. Va. 2010) (in age-discrimination case, whether evidence that decisionmakers "correlated age with technology skills . . . constitute[d] age-bias" was issue for jury").  While "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight," "a supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination."  Brewer, 72 F.3d at 333 (citations omitted).  "[A] factfinder could find [the] comment too abstract to evince age discrimination[, but] it may also be considered by the jury as evidence of the corporate culture in which the employment decision . . . was made, and circumstantial evidence of age discrimination."  Id. at 334.

The Court thus concludes that plaintiff has shown pretext through the second means because, taken as a whole, the evidence would support a jury's conclusion that defendant's decision was motivated by discriminatory animus, not by plaintiff's poor job performance.  See Fuentes, 32 F.3d at 764.

### 5.    Conclusion

The evidence presents genuine disputes of material fact as to whether defendant failed to hire plaintiff as Director of Programs because of his age or because of his failure to perform his duties as Deputy Director of Food Security.  On the present state of the record, the Court denies

Defendant's Motion for Summary Judgment as to Counts I and II of the Amended Complaint.
See Lowe v. Phila. Newspapers, Inc., 594 F. Supp. 123, 128 (E.D. Pa. 1984) (denying a motion
for summary judgment when "a jury could infer intentional discrimination[,] although the events
could also be explained in a non-discriminatory way").

### B.      Race, Color, or National Origin Discrimination: Failure to Hire Plaintiff as Director of Programs

The Court next addresses Counts III and IV of the Amended Complaint, which involve
plaintiff's claim that defendant discriminated against him based on his race, color, and national
origin by not selecting him as Director of Programs.

### 1.      Exhaustion

As a threshold matter, defendant argues that plaintiff "cannot make a claim of race or
national origin discrimination for failure to hire him as the Director of Programs, as he did not
make a claim of race or national origin discrimination in his first EEOC Complaint."  (Def.
Mem. 24 n.9.)  While defendant is correct that "the scope of a resulting private civil action in the
district court is defined by the scope of the EEOC investigation which can reasonably be
expected to grow out of the charge of discrimination," see Hicks v. ABT Assocs., Inc., 572 F.2d
960, 966 (3d Cir. 1978) (quotation marks omitted), defendant ignores plaintiff's September 21,
2010, Amended First EEOC Charge.  "[A]mendments alleging additional acts which constitute
unlawful employment practices related to or growing out of the subject matter of the original
charge will relate back to the date the charge was first received."  29 C.F.R. § 1601.12(b); see
also Hicks, 572 F.2d at 965–66 (amendment adding claim of sex discrimination to charge of race
discrimination relates back where reasonable investigation of original charge would encompass
the added charge).  The Amended First EEOC Charge alleged race, color, and national origin
discrimination based on defendant's decision not to hire plaintiff as the Director of Programs,

which were the same facts alleged in plaintiff's First EEOC Charge.  Accordingly, the Amended

First EEOC Charge relates back to the time when plaintiff filed the First EEOC Charge, and

plaintiff is not barred from proceeding on his race, color, and national origin claims.

### 2.      Prima Facie Case

Title VII[11] prohibits employment discrimination on the basis of "race, color, religion, sex,

or national origin," 42 U.S.C. § 2000e-2(a)(1); see also Huston v. Proctor & Gamble Paper

Prods., 568 F.3d 100, 104 (3d Cir. 2009).  Like ADEA claims, Title VII claims are subject to the

McDonnell Douglas three prong burden-shifting analysis discussed supra.  See Pivirotto v.

Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

The elements of a Title VII prima facie case are: (1) plaintiff is a member of a protected

class; (2) plaintiff was qualified for his position; (3) plaintiff suffered an adverse employment

action; and (4) the circumstances of his discharge permit an inference of unlawful discrimination,

such as might occur when the position is filled by a person not of the protected class.  Waldron v.

SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995).  Plaintiff may demonstrate the fourth element of

the prima facie case by showing that his employer treated a similarly-situated employee who is

not within the protected class differently than him, or by presenting other evidence that would

give rise to an inference of unlawful discrimination against him.  Cange v. Phila. Parking Auth.,

No. 08-3480, 2009 WL 3540784, at *6 (E.D. Pa. Oct. 30, 2009); see also Sarullo, 352 F.3d at

798 (plaintiff must "establish some causal nexus between his membership in a protected class"

and the adverse employment decision).

---

[11] Title VII claims are construed consistently with PHRA claims, and thus the Court's decision
with regard to plaintiff's Title VII claim in Count III applies with equal force to the PHRA claim
in Count IV.  See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d
535, 539 n.5 (3d Cir. 2006).

Plaintiff has made out a prima facie case.  He is a member of a protected class because he is Asian-Indian.  As discussed <u>supra</u> regarding his age discrimination claim, plaintiff has shown for the purposes of this motion that he was minimally qualified for the Director of Programs position.  Plaintiff suffered an adverse employment action when he was not selected for the position.  Finally, he has shown that defendant filled the position with Carson, an African-American, who was outside of plaintiff's protected class.  Accordingly, plaintiff has satisfied his "not onerous" burden of making out a prima facie case.  <u>Burdine</u>, 450 U.S. at 253.

### 3.    Legitimate, Nondiscriminatory Reason

As discussed <u>supra</u>, defendant asserts that plaintiff's job performance as Deputy Director of Food Security was unsatisfactory and that he "failed to obtain food security grants to maintain the financial viability of ICI."  (Def. Mem. 25–26.)  This satisfies defendant's burden of production at the second step of the <u>McDonnell Douglas</u> analysis.

### 4.    Pretext

As discussed <u>supra</u>, there are genuine disputes of material fact as to whether defendant's proffered non-discriminatory reason for not selecting plaintiff as the Director of Programs was pretextual.  <u>See Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996) ("[A] plaintiff will survive summary judgment if s/he can produce sufficient evidence that the employer's proffered nondiscriminatory reason for its employment action was not the true reason.") (citing <u>Brewer</u>, 72 F.3d at 331).  In addition, plaintiff has introduced some evidence that, while more modest than the evidence tending to show age discrimination, supports his contention that defendant's decision constituted discrimination based on race, color, or national origin.  For example, plaintiff has shown that Carson, who got the job, was outside of his protected classes, (<u>see</u> <u>supra</u> footnote 6), and has pointed to at least one instance in which

Affognon made comments tending to show that he was biased against Asian-Indians, (see Pl. Dep. 104–05 ("you Asians, you are weaklings")).  This is sufficient to warrant denial of Defendant's Motion for Summary Judgment.  See Sempier v. Johnson & Higgins, 45 F.3d 724, 732 (3d Cir. 1995) (at summary judgment, "the question for the court is whether the record could support an inference that the employer did not act for non-discriminatory reasons, not whether the evidence necessarily leads to that conclusion that the employer did act for discriminatory reasons") (quotation marks omitted).

### 5.      Conclusion

The evidence presents genuine disputes of material fact as to plaintiff's claims of race, color, and national origin discrimination under Title VII and the PHRA as alleged in Counts III and IV of the Amended Complaint.  Defendant's Motion for Summary Judgment will therefore be denied as to those claims.

### C.      Retaliation Claims

The Court next addresses plaintiff's retaliation claims, set forth in Counts V and VI of the Amended Complaint.  Plaintiff asserts that defendant retaliated against him twice: first, for filing an internal grievance regarding age discrimination by not hiring him as Director of Programs, and second, for filing an EEOC charge by not hiring him as Director of Food Security.

### 1.      Legal Standard

The ADEA[12] provides: "It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or

---

[12] ADEA and PHRA retaliation claims are analyzed under the same standard.  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

The McDonnell Douglas burden-shifting analysis applies to ADEA retaliation claims. Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995). "To establish a prima facie case of retaliation ... a plaintiff must tender evidence that: '(1) [he] engaged in [a protected] activity . . . ; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'" Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). "If the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, non-retaliatory reason for the adverse employment action." Marra v. Phila. Housing Auth., 497 F.3d 286, 300 (3d Cir. 2007) (citations omitted). "If the employer meets its burden, the burden of production returns to the employee, who must now show, by a preponderance of the evidence, that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. (quotation marks and citation omitted).

### 2.   First Claim of Retaliation: Plaintiff Not Selected as Director of Programs

Plaintiff alleges that defendant did not select him as the Director of Programs because he complained about age discrimination arising out of the August 15, 2008, Affognon incident. Defendant argues, inter alia, that plaintiff cannot show that he engaged in protected activity because he "never complained about age discrimination related to Mr. Affognon's treatment of him." (Def. Mem. 31–32.) The Court agrees with defendant.

The Third Circuit has described engaging in a protected activity as "'oppos[ing] any practice made unlawful' by [the ADEA]." Barber, 68 F.3d at 702 (quoting 29 U.S.C. § 623(d)).

"'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management.' To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, 'we look to the message being conveyed rather than the means of conveyance.'" Moore, 461 F.3d at 343 (quoting Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)).  However, at a minimum, the message being conveyed "must identify the employer and the practice—if not specifically, at least by context." Curay-Cramer, 450 F.3d at 135.

Plaintiff asserts that he engaged in protected activity when he reported the August 15, 2008, Affognon incident when he sent the 8/17/08 Grievance Letter to Roth and the 9/30/08 Cooke Letter.  However, even viewed in the light most favorable to plaintiff, the letters alleged disrespectful and aggressive conduct, not age discrimination.[13]  Plaintiff wrote that he was asking for "defamation charges and grievances" because he had been subjected to "verbal aggression, abuse, defamation and disrespect" that he considered "a total violation of the fundamental human rights."  (8/17/08 Grievance Letter 1.)  Plaintiff neither used the phrase "age discrimination" nor any formulation that could reasonably be read to allege age discrimination.

Moreover, plaintiff's argument that he alleged age discrimination because he "reference[d] his age" in the letters, (Pl. Opp'n Mem. 27), is rejected.  Plaintiff referred to himself as "a 63-year-old man with more than 35 years of professional experience of which 13 years have been spent with OICI," (8/17/08 Grievance Letter 1), and as "a senior person in age, in experience and in association with OICI," (9/30/08 Cooke Letter 1); he referred to Affognon as "a new comer who does not have even 4 years experience with OICI," (id. at 1).  Those statements would lead the reader to believe that plaintiff found Affognon's comments inappropriate because of Affognon's relative lack of experience.  Also fatal to plaintiff's

_____

[13] Plaintiff does not argue that he reported race, color, or national origin discrimination.

argument is that the account of the August 15, 2008, incident in the letters omitted key details that would have been consistent with a claim of age discrimination.  For example, unlike at his deposition, plaintiff did not write that Affognon said "This is the problem with you guys.  You're not even familiar with the latest way of doing things."  (Pl. Dep. 79.)  Finally, plaintiff has not alleged that Roth or Kilcrest became aware that he was alleging age discrimination through any other means, such as what plaintiff said when he handed them the 8/17/08 Grievance Letter.

"A general complaint of unfair treatment does not translate into a charge of illegal age discrimination."  Barber, 68 F.3d at 702.  Here, as in Barber, plaintiff's letter did not "explicitly or implicitly allege that age was the reason for the alleged unfairness," id., and thus plaintiff did not engage in protected activity by complaining about the August 15, 2008, incident with Affognon in the 8/17/08 Grievance Letter to Roth or 9/30/08 Cooke Letter.  Thus, plaintiff has failed to make out a prima facie case of retaliation for that alleged protected activity.

### 3.        Second Claim of Retaliation: Plaintiff Not Rehired as Director of Food Security

The second alleged occurrence of retaliation involves defendant's decision not to hire plaintiff as the Director of Food Security.  Defendant concedes that the first prong of an ADEA retaliation claim is met because plaintiff engaged in protected activity by filing the First EEOC Charge and the Amended First EEOC Charge.  (Def. Mem. 33.)  However, defendant argues that the second and third prongs are not satisfied.  The Court will consider each in turn.

As to the second prong, an adverse employment action, defendant asserts that plaintiff "fail[ed] to show that he actually applied for the position": he "was not aware of the Director of Food Security position prior to his meeting with Mr. Kirk[, and] . . . did not read a posting of the position or send in an application."  (Def. Mem. 33.)  Plaintiff responds that he suffered an adverse employment action because he made "every reasonable attempt to convey his interest in

the job to the employer." (Pl. Opp'n Mem. 32, citing <u>EEOC v. Metal Serv. Co.</u>, 892 F.2d 341, 348–49 (3d Cir. 1990).)

The Court rejects defendant's argument because there are genuine disputes of material fact regarding the events that led to the June 28, 2010, meeting at Applebee's, what happened at that meeting, and what happened afterward. Most significantly, there is conflicting evidence on the question whether Kirk offered plaintiff the position of Director of Food Security. These disputes impact whether there was an adverse employment action, which is the second element of a prima facie case of retaliation.[14] <u>See</u> <u>McGuffey v. Brinks Inc.</u>, 558 F. Supp. 2d 565, 573 (E.D. Pa. 2008) (finding genuine dispute of material fact as to whether plaintiff suffered adverse employment action when plaintiff alleged that he "expressed interest in other positions" and told employer that he "wanted to work for [the employer] again," but defendant alleged that plaintiff "was never considered for re-hire").

As to the third element, causal connection, the Court construes defendant's statement that there was "no retaliatory activity" because the parties merely "engaged . . . in failed settlement negotiations" as an argument that the third element is not satisfied. (Def. Mem. 33–34.) Again, there are genuine disputes of material fact that preclude the granting of Defendant's Motion for Summary Judgment on this issue. Defendant is correct that a factfinder could credit Kirk's statement that he simply "was hoping" to hire plaintiff for some unspecified position with defendant to settle plaintiff's EEOC charge and avoid this very lawsuit. (<u>See</u> Kirk Dep. 52–56.) However, the factfinder could also credit plaintiff's theory of events, under which plaintiff was offered and accepted the Director of Food Security position, only to lose it, in Kirk's words,

---

[14] This would be an adverse employment activity even under the standard from the sole case that defendant cites in support of its position, <u>Velez v. Janssen Ortho, LLC</u>, 467 F.3d 802, 807 (1st Cir. 2006), which stated: "plaintiffs asserting discriminatory retaliation must show that they applied for a specific vacant position for which they were qualified, and that they did not get the job." <u>Id.</u>

"because of the legal procedures that [he had] undertaken." (Pl. Dep. 163.) Plaintiff's evidence is sufficient to establish "a causal connection between [plaintiff's] participation in the protected activity and the adverse employment action.'" Moore, 461 F.3d at 340–41; see also Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178–79 (3d Cir. 1997) (holding that causal connection was satisfied through "direct evidence of . . . retaliatory motives" when manager told employee that "she was not on the management track because of," inter alia, "campaigning on women's issues"); McGuffey, 558 F. Supp. 2d at 573 (concluding genuine disputes of material fact precluded summary judgment when person who was "instrumental" in making adverse hiring decision knew about pending EEOC charge).

Defendant has not made any argument as to the second or third stages of the McDonnell Douglas analysis with respect to plaintiff's second claim of alleged retaliation. However, as discussed supra, there are genuine disputes of material fact as to the events that brought about the June 28, 2010, meeting at Applebee's, as well as to what happened during and after the meeting. A jury could reasonably credit defendant's theory of events, under which plaintiff never applied for the Director of Food Security position and Kirk merely sought to engage in settlement discussions. A jury could also find "'both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Moore, 461 F.3d at 342 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997)). Accordingly, Defendant's Motion for Summary Judgment as to plaintiff's claim of retaliation based on the fact that he was not hired as Director of Food Security in June and July 2010, asserted in Counts V and VI of the Amended Complaint, is denied.

### 4.      Conclusion

The Court grants Defendant's Motion for Summary Judgment as to plaintiff's claim of retaliation based on the fact that he was not hired as Director of Programs.  The Court denies the motion as to plaintiff's claim of retaliation based on the fact that he was not hired as Director of Food Security.

## V.      CONCLUSION

The Court denies Defendant's Motion for Summary Judgment as to all claims, excepting only the claim of retaliation based on the fact that plaintiff was not hired as Director of Programs as set forth in Counts V and VI of the Amended Complaint.

An appropriate Order follows.